IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AARON WHITTLE<br>19 Crenshaw Court<br>Middletown, DE 19709 | : CIVIL ACTION – LAW<br>: NO.<br>:<br>: |
| Plaintiff, | :<br>: |
| vs. | : *Electronically filed*<br>: |
| LINCOLN UNIVERSITY – OF THE<br>COMMONWEALTH SYSTEM OF<br>HIGHER EDUCATION<br>1570 Baltimore Pike<br>Lincoln University, PA 19352 | :<br>: JURY TRIAL OF 12 DEMANDED<br>:<br>:<br>: |
| Defendant. | : |

**COMPLAINT**

**JURISDICTION**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 as the action arises under Title VII, 42 U.S.C. §2000e, *et seq*. Plaintiff Aaron Whittle's Title VII Notice of Right to Sue letter was issued on April 15, 2025 and a copy is attached hereto as Exhibit A. This Complaint was filed within 90 days of receipt of that Notice. Plaintiff cross-filed this matter under the Pennsylvania Human Relations Act, 43 Pa.C.S. §951, *et seq*., with the Pennsylvania Human Relations Commission and it has been one year since that cross-filing. Plaintiff seeks the Court to deem his PHRA action filed as one year has passed. This Court has supplemental jurisdiction over the state law claims

1

pursuant to 28 U.S.C. §1367 because they are so related to the federal claims that they form part of the same case.

2. Venue is proper in the Eastern District of Pennsylvania because Plaintiff worked in this district for Defendant and Defendant is located in Lincoln University, Chester County, Pennsylvania.

**FACTUAL ALLEGATIONS**

3. Plaintiff Aaron Whittle ("Plaintiff") is an adult male, currently residing at 19 Crenshaw Court, Middletown, DE 19709. At the time of the incidents named in the Complaint, Plaintiff resided at 1112 Vinings Way, Newark, Delaware 19702.

4. Defendant Lincoln University – of the Commonwealth System of Higher Education ("Defendant") is a Pennsylvania domestic nonprofit corporation located at 1570 Baltimore Pike, Lincoln University, PA 19352.

5. Plaintiff is in protected classes because of his sex (Plaintiff is a transgender male; his gender identity is male; his gender expression is male, he is transgender as he experienced a transition from female to male).

6. Plaintiff is also protected from retaliation under Title VII law for reporting discrimination and harassment for his membership in protected classes.

7. On or about February 23, 2023, Plaintiff was hired by Defendant as a Public Safety Officer.

8. Plaintiff had been hired to work rotating 12-hour shifts on a biweekly basis Defendant, and at times would have to work 18-hour shifts.

9. Plaintiff was terminated by Defendant for membership in a protected class and in retaliation for complaints of discrimination.

10. At the time of Plaintiff's hire, Defendant was aware of Plaintiff's gender identity, transgender, as Plaintiff had to submit his birth certificate to Defendant for photocopying at the time of hire, which identified his gender as female.

11. Prior to working at Defendant, Plaintiff had worked in security as a Certified Security Officer (CSO) for nine (9) years.

12. On Tuesday, April 25, 2023, Plaintiff alerted Human Resource Representative Donna Hess via email that Plaintiff had received a text message on Friday, April 21, 2023 from Sgt. Basquill informing him that his shift – his hours and days – would be changed effective immediately.

13. Via text message on April 21, 2023, Sgt. Basquill told Plaintiff that if he did not adjust his schedule immediately then Plaintiff would end up short on hours for the week.

14. Plaintiff was not due to work on the upcoming Thursday originally, and was instead due to work that Friday (end of the work week) and then through that weekend. Plaintiff additionally had personal appointments on his regularly

3

scheduled days off, and therefore Plaintiff did, in fact, end up short on hours for the week as a result of the last-minute shift change.

15. None of Defendant's other employees had been switched to another shift.

16. A new hire was placed on Plaintiff's previous shift.

17. As a Public Safety Officer at Defendant, there was a required uniform.

18. Plaintiff's previous Supervisor, Sgt. Clayton, told a fellow employee (last name Rodriguez) to bring in an extra shirt for Plaintiff's uniform.

19. Fellow employee Rodriguez brought in his girlfriend's shirt (who used to be employed by Defendant).

20. This shirt was a female (womanly cut) shirt.

21. Plaintiff informed his Supervisor at the time, Sgt. Thompson, that the shirt did not fit him properly as it was a female/ womanly cut shirt.

22. Plaintiff, however, was told that they did not have anything else and was not supplied with a uniform that fit properly.

23. Plaintiff believes, and therefore avers, that he was provided female (womanly cut) shirts in order to embarrass him and to retaliate against him for his transgender status.

24. In or around April 2023, in a meeting with Sgt. Clayton, Plaintiff received a write-up for tardiness.

4

25. During this meeting, Plaintiff complained to Sgt. Clayton that his being written up for tardiness was unfair since there were many other employees with either no-shows, call-outs and/or drinking alcohol on the clock without any consequences.

26. Following Plaintiff's write-up for tardiness, in May 2023, Detective Nicholson (who the sergeants report to) asked Plaintiff to make a list regarding fellow coworkers that may have warranted write-ups/disciplinary action, based upon either statements from other officers and/or what Plaintiff may have witnessed firsthand.

27. On May 19, 2023, Detective Nicholson said that he had not received the 'list' from Plaintiff.

28. Plaintiff told Detective Nicholson that he was still compiling the list and that he would email it to Human Resources.

29. Detective Nicholson told him that this "cannot go to HR, it has to come to me first."

30. On May 25, 2023, Plaintiff sent an email to Human Resources, making Human Resources aware of what Detective Nicholson had said to him regarding 'the list' and also shared his concerns regarding discrimination as Plaintiff seemed to be the only employee receiving disciplinary action for lesser offenses. Plaintiff relayed that he was aware of multiple fellow officers who had shown up late on various occasions, had called out consecutively, and had even

been caught drinking on the job. However, none of these fellow employees had been written up and/or disciplined; unlike Plaintiff.

31. On May 30, 2023, Plaintiff stopped by the Human Resources department. They were in a meeting at the time and Plaintiff asked if he could come back.

32. That same day, May 30, 2023, Plaintiff emailed Vice President of Human Resources Jake Tanksley and requested a meeting with him. Plaintiff also forwarded to Mr. Tanksley the previous May 25, 2023 email sent to Human Resources.

33. Plaintiff initially asked to meet with Mr. Tanksley that same day, May 30th, or Friday, June 2nd (both days when Plaintiff was scheduled and would be at work). However, Mr. Tanksley was not available.

34. In this same May 30, 2023 email to Mr. Tanksley, Plaintiff additionally offered to come in on his day off, the following Monday, June 5, 2023 at 9:00 a.m.

35. Mr. Tanksley replied to Plaintiff's email on Monday, June 5th at 8:38 a.m. stating that he could meet with Plaintiff. However, since not hearing from Mr. Tanksley sooner, Plaintiff had by that time scheduled a doctor's appointment for that morning.

36. Upon returning to work on Thursday, June 8, 2023 (Plaintiff's next scheduled work day), Plaintiff emailed Mr. Tanksley and asked if he was available to meet.

37. Plaintiff received an automatic reply stating that Mr. Tanksley was out of the office from June 8 until June 13, 2023.

38. On May 27, 2023, Plaintiff's 3-month probationary period with Defendant ended.

39. At the end of Plaintiff's shift, approximately one week *after* his probationary period ended, Detective Nicholson told Plaintiff he needed to speak with him in his office.

40. Detective Nicholson then attempted to extend Plaintiff's probationary period, without due cause.

41. Detective Nicholson would not and did not provide Plaintiff with any basis for wanting to extend his probationary period, told Plaintiff to sign a paper, and then refused to provide Plaintiff a copy of the paper unless Plaintiff agreed to sign it.

42. Detective Nicholson told Plaintiff that it was his choice – he could either extend his probationary period or they could go to Human Resources and he would be terminated.

43. Plaintiff refused to sign the paper.

7

44. Plaintiff asked Detective Nicholson before leaving his office if he still had a job, and Detective Nicholson said he did.

45. Plaintiff believes the attempt to extend his probation after he vested was because Defendant wanted to fire Defendant in retaliation for complaints of discrimination and because of his transgender status.

46. On June 12, 2023, Plaintiff was seen at ChristianaCare Urgent Care for respiratory infection symptoms.

47. Plaintiff received an Excuse from Work note from Dr. Deborah Dougherty for dates June 12, 2023 through June 14, 2023.

48. On June 13, 2023, Plaintiff decided to go to work and try to work through his shift, even though he was still not feeling well.

49. Plaintiff provided Sgt. Thompson with his Excuse from Work note.

50. On that same day, June 13, 2023, Sgt. Thompson gave him permission to go grab lunch at one point, and Plaintiff did so.

51. Plaintiff proceeded to sit in his car in the parking lot with his lunch.

52. While Plaintiff was eating his lunch, Sgt. Thompson drove over to his car and began yelling at him.

53. Sgt. Thompson yelled at Plaintiff stating that Defendant's President had just walked by and that she should not see him eating in his car.

54. There were no rules regarding eating lunches in the parking lot, and the President had actually not even walked near Plaintiff's car.

55. Sgt. Thompson then told Plaintiff to go home for the rest of the day.

56. Instead of leaving that day on June 13th, Plaintiff attempted to contact Vice President of Human Resources Jake Tanksley.

57. Plaintiff called Mr. Tanksley several times, and Mr. Tanksley picked up on the third attempt.

58. Mr. Tanksley told Plaintiff that he was in a meeting and that he would call him back. Mr. Tanksley did not call him back, and Plaintiff ended up going home.

59. Plaintiff also contacted Human Resources Representative Donna Hess via text that same day, June 13th, and requested a one-on-one meeting with Chief Marc Partee (ranking above Det. Nicholson).

60. Ms. Hess texted Plaintiff later that she had passed on the message, and that the Chief said he would call Plaintiff. Chief Partee however never contacted Plaintiff.

61. On June 14, 2023, Plaintiff received an email from Mr. Tanksley, stating that Plaintiff was a no-show for a meeting that morning with Mr. Tanksley.

62. Plaintiff denies that he was a no-show for a meeting with Mr. Tanksley.

63. Plaintiff attempted to contact Mr. Tanksley to set up a meeting numerous times prior to that point in time.

9

64. On June 14th Plaintiff was still feeling ill, not to mention covered by his Excuse from Work note for his illness, *and* it was also Plaintiff's scheduled day off of work.

65. Plaintiff attempted to call Mr. Tanksley once again at his main office number that morning, and was unable to contact him.

66. That same day, on June 14, 2023, Plaintiff received a termination notice via email from Vice President for Human Resources Jake Tanksley. The reason stated in the termination notice was "due to an unsatisfactory probationary period and insubordination."

67. Plaintiff avers that his termination was illegal.

68. Plaintiff attests that he received disciplinary action, and termination, when other employees received no disciplinary action for much greater workplace violations, some reoccurring, because he was in a protected class and because of his complaints of discrimination.

69. Plaintiff concludes from his various attempts to interact with Vice President of Human Resources Jake Tanksley, which only resulted in not being called back, being expected to meet on Plaintiff's days off, or simply being 'put off', that Mr. Tanksely did not intend to meet and/or investigate Plaintiff's complaints of discrimination.

70. Plaintiff did not intentionally miss any meetings which were scheduled on his work days, and the claim made by Mr. Tanksley that Plaintiff was a no-show for the meeting was false in order to terminate him.

71. Plaintiff avers that this no-show claim by Mr. Tanksley was made in retaliation following Plaintiff's written complaint of discrimination in order to keep Plaintiff from elaborating further upon his claims of discrimination in person to Mr. Tanksley and/or Human Resources.

72. Defendant engaged in sex discrimination against Plaintiff, treating Plaintiff differently than non-similarly situated employees who were not transgender individuals, attempting to prolong Plaintiff's probationary period, and ultimately terminating Plaintiff.

73. Defendant retaliated against Plaintiff because Plaintiff reported discrimination to Human Resources and Vice President of Human Resources Jake Tanksley.

74. Plaintiff believes that Defendant discriminated and retaliated against him based on his sex in violation of Title VII of The Civil Rights Act of 1964 as amended.

75. Defendant acted with malice or reckless indifference to Plaintiff's federally-protected rights.

76. At the time of his termination, Plaintiff was earning about $19.09 an hour.

77. At all relevant times, Defendant did not act in good-faith and the activity of terminating or failing to continue to employ Plaintiff was done in consultation with second-line supervisors or above and Human Resources officials.

78. Defendant's activity herein was not done pursuant to good-faith practices in anti-discrimination requiring Kolstad liability.

79. No similarly-situated members of other protected classes were treated in this fashion.

80. Plaintiff has suffered damages from all the conduct expressed herein including wage loss, compensatory damages, damages for pain, suffering, and humiliation as well as is eligible for punitive damages under relevant law.

## COUNT I
## AARON WHITTLE V. LINCOLN UNIVERSITY
### VIOLATION OF TITLE VII
### DISCIMINATION ON BASIS OF SEX

81. Plaintiff incorporates paragraphs 1 through 80 above as if set forth herein.

82. Plaintiff is in a protected class due to his sex.

83. Plaintiff was treated differently on the terms and conditions of his employment because of his sex.

84. Plaintiff suffered adverse employment action(s) because of his sex, including termination.

85. There is a causal connection between the adverse employment action sustained by Plaintiff and his membership in the protected class.

86. Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands the following relief: (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) equitable relief such as rehiring; (3) a reasonable attorney's fee; (4) the employee's expert witness fee, if any; (5) damages for pain, suffering, humiliation, and emotional distress; (6) punitive damages; (7) other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

## COUNT II
## AARON WHITTLE V. LINCOLN UNIVERSITY
## VIOLATION OF TITLE VII -- RETALIATION

87. Plaintiff incorporates paragraphs 1 through 86 above as if set forth herein.

88. Plaintiff engaged in a protected activity.

89. Plaintiff suffered adverse employment action(s) because of his protected activity, including termination.

90. Plaintiff has a good-faith, reasonable belief that his conduct was a protected activity.

91. There is a causal connection between the adverse employment action sustained by Plaintiff and his protected activity herein.

92. Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands the following relief: (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) equitable relief such as rehiring; (3) a reasonable attorney's fee; (4) the employee's expert witness fee, if any; (5) damages for pain, suffering, humiliation, and emotional distress; (6) punitive damages; (7) other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

## COUNT III
## AARON WHITTLE V. LINCOLN UNIVERSITY
## VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT-- DISCIMINATION ON BASIS OF SEX

93. Plaintiff incorporates paragraphs 1 through 92 above as if set forth herein.

94. Plaintiff is in a protected class due to his sex.

95. Plaintiff was treated differently on the terms and conditions of his employment because of his sex.

96. Plaintiff suffered adverse employment action(s) because of his sex, including termination.

97. There is a causal connection between the adverse employment action sustained by Plaintiff and his membership in the protected class.

98. Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands the following relief: (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) equitable relief such as rehiring; (3) a reasonable attorney's fee; (4) the employee's expert witness fee, if any; (5) damages for pain, suffering, humiliation, and emotional distress; (6) punitive damages; (7) other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's <u>Eshelman</u> doctrine.

## COUNT IV
## AARON WHITTLE V. LINCOLN UNIVERSITY
## VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT -- <u>RETALIATION</u>

99. Plaintiff incorporates paragraphs 1 through 98 above as if set forth herein.

100. Plaintiff engaged in a protected activity.

101. Plaintiff suffered adverse employment action(s) because of his protected activity, including termination.

102. Plaintiff has a good-faith, reasonable belief that his conduct was a protected activity.

103. There is a causal connection between the adverse employment action sustained by Plaintiff and his protected activity herein.

104. Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands the following relief: (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) equitable relief such as rehiring; (3) a reasonable attorney's fee; (4) the employee's expert witness fee, if any; (5) damages for pain, suffering, humiliation, and emotional distress; (6) punitive damages; (7) other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

Respectfully submitted,

Date: __June 18, 2025__   BY: _s/ Edward C. Sweeney_
                                                     Edward C. Sweeney, Esquire
                                                     Attorney for Plaintiff
                                                     I.D. No. 64565
                                                     102 Pickering Way, Suite 403
                                                     Exton, PA 19341
                                                     (610) 594-1600
                                                     Validation of signature code: ECS1942

# EXHIBIT A

## Ed Sweeney

**From:** DOJ Civil Rights - Do Not Reply <civilrightsdonotreply@mail.civilrights.usdoj.gov>
**Sent:** Tuesday, April 15, 2025 9:34 AM
**To:** Ed Sweeney
**Subject:** Response: Your Civil Rights Division Report - 596577-JQX from the Employment Litigation Section



596577-JQX

**NOTICE OF RIGHT TO SUE WITHIN 90 DAYS**

Apr 15, 2025

Aaron Wittle

whittleaaronj@gmail.com

Re:   Aaron Wittle v. LINCOLN UNIVERSITY - OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, et al.,
EEOC Charge No. 530-2024-03753

Dear Aaron Wittle,

You are receiving this notice because you filed the above charge(s) with the Equal Employment Opportunity Commission (EEOC), and you or your attorney specifically requested this notice.

Because either 180 days have passed since you filed the above charge(s), or because the EEOC has determined that it will not be able to conclude its administrative process within 180 days of the date it assumed jurisdiction of the charge(s), you are hereby notified that

1

you have the right to file a lawsuit commencing a civil action based on the charge(s) under the following statute(s):

- Title VII of the Civil Rights Act of 1964, 42 USC. 42 U.S.C. § 2000e, et seq.

If you decide to file a lawsuit under the statute(s) identified above, **you must file it in the appropriate court within 90 days of receiving this Notice**. This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether your charge is meritorious. If you haven't already, you may want to consult with a private attorney of your own choosing and expense.

If you have questions or wish to inspect the investigative file pertaining to this matter, please address your inquiry to the following EEOC office: Philadelphia District Office. Contact information for this office can be located at https://www.eeoc.gov/field-office/philadelphia/location.

Sincerely,

Complaint Referral Unit
Employment Litigation Section
Civil Rights Division

**Contact**

civilrights.justice.gov

 U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

 (202) 514-3847
1-855-856-1247 (toll-free)
Telephone Device for the Deaf
(TTY) (202) 514-0716

